**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOSETTE A. RUFF,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-01784-AMK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Josette Ruff seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 15.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I. Procedural History

Ms. Ruff filed her DIB and SSI applications on January 26, 2023, alleging a disability onset date of December 1, 2022. (Tr. 78-79.) She later amended the alleged onset date to January 1, 2023. (Tr. 67.) She alleged disability due to migraines, autonomic instability, asthma, mental health disorders, back pain, Barrett's disease, and cholecystectomy syndrome. (Tr. 80, 89.) Her claims were denied at the initial level (Tr. 78-79) and upon reconsideration (Tr. 98-99), and she requested a hearing (Tr. 137). An Administrative Law Judge ("ALJ") held a telephonic hearing on June 14, 2024 (Tr. 41-77) and thereafter issued an unfavorable decision on

July 17, 2024 (Tr. 14-40). Ms. Ruff requested review by the Appeals Council, and her request was denied, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4.)

Ms. Ruff filed the instant Complaint on August 27, 2025 (ECF Doc. 1) raising the following assignment of error:

The ALJ erred by failing to create an RFC that is supported by substantial evidence.

(ECF Doc. 10, p. 11.) The matter is fully briefed and ripe for decision. (ECF Docs. 10, 11, 13.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Ruff was born in 1986 and was 37 years old on the amended alleged onset date, making her a younger individual under Social Security regulations. (Tr. 80, 89.) She had at least a high school education. (Tr. 283.) She has past relevant work as a dental assistant. (Tr. 33.)

### B. Medical Evidence

#### 1. Relevant Treatment History[1]

On January 20, 2023, Ms. Ruff presented to her primary care provider ("PCP"), John E. Hanicak, M.D., at Cleveland Clinic Foundation ("CCF") Lakewood Family Health Center ("FHC") for a follow up. (Tr. 369-72 (dup. at Tr. 858-61).) She reported being unable to stand for more than a few hours due to worsening, chronic thoracic and lumbar back pain and had recently quit her job. (Tr. 369.) On physical examination, all systems were normal. (Tr. 371.) Dr. Hanicak diagnosed autonomic instability based on reports of lightheadedness with position changes, recommended nutrition, fluids, and activity, and instructed Ms. Ruff to follow up if anything changed or worsened. (*Id.*) He also diagnosed migraine with aura, severe persistent

[1] While the ALJ found severe physical and mental health impairments (Tr. 20), Ms. Ruff's arguments are based on her physical RFC (ECF Doc. 10). The Court's summary is generally limited to the evidence cited in the parties' briefs that is from the disability period and relevant to the legal and factual issues before the Court.

asthma, and acute right-sided low back pain with right-sided sciatica. (Tr. 371-72.) He recommended physical therapy for back pain and continuing management of migraines and asthma, noting that Ms. Ruff had been seen by neurology for migraines but had not yet started her medication. (Tr. 372.)

On January 23, 2023, Ms. Ruff attended a physical therapy evaluation with Joshua Thomas, PT, DPT. (Tr. 366-69.) She complained chiefly of ongoing thoracic and lumbar pain that was 7-9/10 and radiated into the right leg. (Tr. 366-67.) She reported her pain interfered with activities of daily living ("ADL") and with rising from a chair, sitting, standing, walking, using stairs, heavy exertion, physical activities, lifting, working, and sleeping. (Tr. 366.) PT Thomas opined that Ms. Ruff's prognosis was fair due to multiple co-morbidities and the chronic nature of her impairments. (*Id.*) He recommended eight physical therapy visits over eight weeks with a home exercise program. (*Id.*) On physical examination, Ms. Ruff displayed: tenderness to palpation over the lumbar and thoracic spines; 4/5 strength in the hips and knees; decreased speed with standing from sitting; positive straight leg test bilaterally; positive slump test on the right and negative on the left; independence on stairs; decreased walking cadence and step length; and grossly intact sensation, moderately limited extension/flexion, and minimally limited side-bend with increased pain in the lumbar spine. (Tr. 367-68.)

Ms. Ruff attended physical therapy appointments from January 23 through April 17, 2023 with Tyler Hewett, PT. (*See* Tr. 351-53 (3/9/2023), 566-68 (3/31/2023), 654-56 (4/4/2023), 645-48 (4/17/2023).) She often reported fatigue and muscle soreness following therapy sessions (*see, e.g.,* Tr. 566, 655), but she reported improvement in symptoms on March 31, 2023 (Tr. 567). Her physical examinations consistently showed minimally to moderately limited range of motion with increased pain in the lumbar back, decreased strength in the lower extremities, tenderness to

palpation in the cervical spine, and "high levels of pain" in the lower extremities during examination. (*See e.g.,* Tr. 352-53, 655-56, 647.) On April 17, 2023, Ms. Ruff and PT Hewett decided to discontinue physical therapy after only five visits due to "medical/psychosocial complications." (Tr. 646.)

On March 21, 2023, Ms. Ruff attended a follow-up at her PCP's office with Elissa Eichler, APRN, CNP. (Tr. 846-48 (dup. at 574-76).) She reported ongoing difficulty breathing despite taking medication, tension, sinus and cluster headaches, episodes of sweating, and chronic GI issues. (Tr. 846.) Her physical examination was normal throughout. (Tr. 848.) CNP Eichler assessed polyarthralgia, ordered an autoimmune workup, and recommended counseling and grief management, massage therapy, and acupuncture as possible treatments. (*Id.*) She also assessed migraine with aura and with status migrainosus, not intractable, and recommended discontinuing oral contraceptives as a possible treatment. (Tr. 848-49.)

On April 3, 2023, Ms. Ruff attended a new patient evaluation with Sameh Rizkal Yonan, M.D., in pain management at CCF Strongsville FHC. (Tr. 556-66.) She reported dizziness, weakness, migraine headaches, and thoracic, right low back, and left chest wall pain that was 7-10/10. (Tr. 556-57, 560.) Dr. Yonan reviewed an x-ray of the thoracic spine from November 21, 2022, that showed thoracolumbar scoliosis. (Tr. 561-62.) On physical examination, Ms. Ruff was well appearing and in no acute distress. (Tr. 564.) She displayed no pain to palpation over the lumbar spine, full range of motion in the back without reproducible pain, negative straight leg tests bilaterally, normal joints, normal gait, 2+ deep tendon reflexes, 5/5 motor strength, and intact sensation throughout. (*Id.*) Dr. Yonan referred her for an evaluation regarding spine surgery but noted that she did not believe Ms. Ruff was well suited for surgical correction at that time. (Tr. 565.) She diagnosed chronic pain syndrome, scoliosis of the thoracolumbar region,

tension headache, and chronic right-sided low back pain with right-sided sciatica. (*Id.*) She also referred Ms. Ruff to a pain center, physical and aquatic therapy, and a headache clinic. (*Id.*)

Ms. Ruff underwent an x-ray of the thoracic and lumbar spines on April 26, 2023. (Tr. 670-71.) It showed thoracolumbar scoliosis. (Tr. 670.)

On May 11, 2023, at CNP Eichler's referral, Ms. Ruff saw Ann Rutt, APRN, CNP, for an integrative medicine consultation with the goal of reducing symptoms of difficulty breathing, headaches, and chronic pain. (Tr. 811-16.) After discussing Ms. Ruff's physical activity, sleep, nutrition, screen habits, and mental health history (Tr. 814), CNP Rutt assessed chronic pain syndrome, severe persistent asthma, and intractable headache, unspecified type (Tr. 814-15). She referred Ms. Ruff to acupuncture and chiropractic care (Tr. 816) and made recommendations regarding supplements, nutrition, activity, and sleep (Tr. 815).

On May 23, 2023, at Dr. Yonan's referral, Ms. Ruff presented to Stephen Samples, M.D., for evaluation of headaches. (Tr. 630-34.) She reported throbbing headaches every day that caused nausea, photophobia, phonophobia, and osmophobia. (Tr. 630.) On examination, she was cogent and fluent, her neck was tender, cranial nerves were intact, she had 5/5 strength in all extremities, her sensory examination was grossly symmetric to light touch and temperature, her reflexes were 2+ in all extremities with negative Hoffman's, she had no ankle clonus, her gait was normal, and her Romberg was negative. (Tr. 631.) Dr. Samples diagnosed intractable migraine headaches, ordered a CT scan of the head and neck, and increased Ms. Ruff's prescription for Depakote from 125 to 500 mg. (*Id.*)

Ms. Ruff attended a pulmonary evaluation on May 26, 2023, with Neha Solanki, M.D. (Tr. 626-30.) She was taking theophylline and Dulera, which was helping. (Tr. 627.) She had recently started Dupixent, which helped at first, then she started feeling worse again. (*Id.*) A

recent spirometry had been normal, but forced vital capacity was low. (*Id.*) On examination, her lungs were clear to auscultation, with no wheezing, rhonchi, or rales. (Tr. 630.) Two pulmonary function labs in June 2023 showed normal spirometry, mild obstruction, and no significant bronchodilator response. (Tr. 759, 777-78.)

Ms. Ruff underwent a CT scan of the head on July 13, 2023. (Tr. 750-51.) It showed no acute intracranial abnormality. (Tr. 750.)

On July 28, 2023, Ms. Ruff followed up with Dr. Hanicak regarding swelling in the arms, weakness and numbness in the arms and legs, and problems with her hiatal hernia. (Tr.798.) Gabapentin was helping, and she had started taking Nurtec. (*Id.*) Her physical examination was normal throughout. (Tr. 801.) Dr. Hanicak diagnosed asthma, autonomic instability, and migraine with aura and status migrainosus, not intractable. (Tr. 801-02.) Asthma was stable, and Ms. Ruff was following with neurology for autonomic instability and migraines. (*Id.*)

On August 2, 2023, Ms. Ruff attended a new chiropractic patient examination with Candice Price, DC. (Tr. 712-15.) She reported neck and low back pain that traveled down both legs, worse on the right, migraines, and pain/weakness in the hands and feet. (Tr. 712.) Her physical examination showed: 5/5 strength at C5-T1 and 4/5 strength at C6; reduced cervical range of motion in right lateral flexion, left lateral flexion, and left rotation; negative Spurling's; localized tenderness in the bilateral cervical-thoracic junction; no midline bony tenderness; reduced lumbar range of motion with flexion, extension, right lateral flexion, right rotation, and left rotation; positive Erichsen's sign bilaterally; positive sacral thrust test; muscle spasms in multiple back and leg muscles; and segmental dysfunction at T2, T5, T6, T7, T10, L3, L4, L5, right pelvis, and left pelvis. (Tr. 714-15.) While standing, her left ilium appeared higher than the right ilium; and when lying down, her right leg appeared shorter than her left leg. (Tr. 715.)

DC Price conducted manual therapy and recommended returning one to two times per week for three to six weeks. (*Id.*) She also ordered cervical imagery due to the chronicity of Ms. Ruff's migraines and other symptoms. (*Id.*)

Ms. Ruff underwent an X-ray of the cervical spine on August 4, 2023, which showed minor C6-C7 disc space narrowing. (Tr. 747).

That same day, Ms. Ruff attended a follow-up appointment with Danielle Short, P.A., at the CCF Strongsville FHC Respiratory Institute. (Tr. 696-99.) She reported feeling "suction pressure" on all sides of her lung that caused shortness of breath after a recent chiropractic visit. (Tr. 697.) Her oxygen saturation rate was 100 percent (*id.*), and she was in no acute distress with clear lungs and good lung sounds in all lung fields (Tr. 698). P.A. Short noted that a CT scan of Ms. Ruff's chest from September 2022 showed no evidence of acute abnormality and no interstitial lung disease. (Tr. 698-99.) She assessed other chest pain, dyspnea and respiratory abnormalities, abnormal PFTs, severe persistent asthma, and allergies. (Tr. 699.) She continued Ms. Ruff's asthma regimen of Dulera, Dupixent, theophylline, and albuterol, recommended Tylenol and ibuprofen for chest pain, and ordered tests to address dyspnea. (*Id.*)

On August 26, 2023, Ms. Ruff presented to Jacob Wolfe, D.O., at her PCP's office. (Tr. 794-96.) She reported experiencing multiple episodes of feeling like she lost consciousness the previous evening. (Tr. 794.) She then felt lightheaded and dizzy, went to sleep, and woke around 1:00 a.m. with a migraine. (*Id.*) She did not take anything for the migraine, and it resolved by the time of the appointment. (*Id.*) On physical examination, she was in no acute distress, her heart rate and pulmonary effort and sounds were normal, her cervical range of motion was normal, her coordination, motor function, and sensation were intact, her gait was normal, and her reflexes were normal and symmetric. (Tr. 795-96.) Her orthostatic vitals were

also normal; while her heart rate was mildly elevated during orthostatic testing, Dr. Wolfe noted this could be due to her having taken Adderall and albuterol prior to the appointment. (Tr. 796.) He diagnosed lightheadedness and migraine with aura and without status migrainosus, not intractable; but he noted that Ms. Ruff's symptoms could be secondary to dehydration, autonomic instability, or migraines considering her normal neurologic examination and a recent normal CTA. (*Id.*) He advised her to follow up with her neurologist. (*Id.*)

On November 16, 2023, Ms. Ruff attended an appointment at the Cleveland Clinic Epilepsy Center Outpatient Clinic with Daniah Shamim, M.D. (Tr. 1081-85.) She reported having untreated seizures as a young child and experiencing possible seizure events again since having Covid-19 in 2020. (Tr. 1081.) She further reported occasionally experiencing a strong nickel taste or burning smell, her whole right side going numb for hours, and visual and auditory hallucinations. (*Id.*) Her neurological examination was normal (Tr. 1084), and Dr. Shamim noted that a September 2023 EEG was normal (Tr. 1082). Dr. Shamim assessed comorbid epilepsy and non-epileptic events. (Tr. 1085.) She ordered an EMU and instructed Ms. Ruff to keep a seizure diary; she also discussed a referral to psychiatry, but Ms. Ruff declined. (*Id.*)

Ms. Ruff underwent a pulmonary function lab on December 5, 2023. (Tr. 1120-26.) The overall pattern of the testing did not appear consistent with a respiratory limitation to exercise or with asthma related exercise intolerance. (Tr. 1126.) Instead, testing suggested reduced aerobic fitness with an accelerated heart rate response to exercise. (*Id.*)

On January 23, 2024, Ms. Ruff attended a new patient evaluation with David W. Polston, M.D., at Cleveland Clinic Neuromuscular Center for a workup of dyspnea and evaluation for neuromuscular junction disorder. (Tr. 1051-53.) She reported intermittent right hemibody numbness and weakness, gustatory aura, auditory hallucinations, and tinnitus. (Tr. 1052.) On

neurological examination she was fully oriented, alert, and attentive, reflexes were 2+, sensation was intact, and cognition, memory, speech, affect, cranial nerves, motor function, coordination, and gait were normal. (*Id.*) Dr. Polston concluded that little evidence supported a primary neuromuscular disorder, episodic weakness disorder, or progressive dystrophy. (Tr. 1053.) He ordered an MRI of the cervical spine. (*Id.*)

At Dr. Polston's referral, Ms. Ruff participated in physical therapy from February 13 through at least May 24, 2024. (*See* Tr. 1017-20 (dup. at 1282-85) (4/9/2024), 1042-47 (2/13/2024), 1153-4 (documenting appointments on May 7, 10, 14, 17, 21, & 24), 1229-31 (5/24/2024), 1245-47 (5/10/2024), 1250-51 (5/1/2024), 1271-73 (4/26/2024), 1277-79 (4/20/2024).) At her initial evaluation in February 2024 with Kelly Campagna, P.T., Ms. Ruff was impaired in overall function, posture, and range of motion, but her prognosis was good. (Tr. 1043.) On physical examination, she displayed no tenderness to palpation in the cervical spine, normal to minimally limited cervical range of motion, normal range of motion in the upper extremities, 4/5 or 5/5 strength in the upper extremities, and normal gait. (Tr. 1044-45.) Ms. Ruff continued physical therapy with PT Hewett and often reported daily migraines and soreness. (*See, e.g.,* Tr. 1018, 1230, 1246, 1278.) Her physical examinations, when conducted, consistently noted normal to minimally limited cervical range of motion and 3/5 or 4/5 strength in the shoulders. (*See, e.g.,* Tr. 1019, 1247.) On April 26, she was having difficulty breathing (Tr. 1271), and session activity on May 1 was decreased due to dizziness and significant soreness in the shoulders and neck (Tr. 1250). At the last documented appointment on May 24, she tolerated the session with fatigue and expected muscle soreness; she and PT Hewett planned to discuss discontinuing physical therapy at the next session. (Tr. 1229.)

Ms. Ruff followed up with Dr. Hanicak on March 20, 2024. (Tr. 1022-26.) She reported that a recent occipital nerve block helped for three days, but her head and neck again felt "hot" and painful. (Tr. 1022.) She reported two to three migraines a day, shortness of breath, severe anxiety, and feeling electrical shocks in her face and shooting from her shoulders down to her fingers. (Tr. 1022-23.) No physical examination findings were noted. (Tr. 1025.) Dr. Hanicak discussed alternative migraine treatments and continued asthma medications. (Tr. 1026.)

From April 22 through at least May 23, 2024, Ms. Ruff received acupuncture to treat chronic migraines. (Tr. 1231-33 (5/23/2024), 1234-36 (5/17/2024), 1247-49 (5/10/2024), 1273-77 (4/22/2024).) By the last documented visit, she reported lower anxiety, ability to sleep seven hours at night, and less headaches. (Tr. 1231.)

On May 17, 2024, Ms. Ruff attended a virtual appointment with Koli Green, APRN, CNP, at the Cleveland Clinic Headache Center. (Tr. 1236-43.) She reported "almost daily headaches" despite trying multiple medications. (Tr. 1237.) CNP Green reviewed a CT scan of the head and neck from November 21, 2023 that was normal (Tr. 1239) and an MRI of the head/brain from February 12, 2021 that showed patent intracranial vasculature (Tr. 1241). She did not conduct a physical examination, but she noted that Ms. Ruff was alert and fully oriented, did not display pain behaviors, and was able to sit upright in a chair for the entire visit. (Tr. 1242.) She noted that asthma precluded use of beta blockers to treat headaches (Tr. 1237) and recommended continuing physical therapy, prescribed a trial of Ajovy, and referred Ms. Ruff to pain psychology to treat the emotional distress component of her headaches (*id.*).

**2. Opinion Evidence**

**i. Dr. Michelle Godek and PT Jamie Hart**

On March 15, 2023, at Dr. Hanicak's referral, Ms. Ruff underwent a KEY Whole Body Functional Capacity Assessment ("FCA" or "FCE") with Michelle Godek, AT, Ph.D. and Jamie Hart, PT, AT, DPT. (Tr. 542-50.) They opined that Ms. Ruff could: work four hours, sit four hours, stand one hour, and walk two to three hours in an eight-hour workday; occasionally lift up to 19 pounds and carry up to 17 pounds; frequently lift up to 8 pounds and carry up to 7 pounds; occasionally push/pull up to 35 pounds and frequently push/pull up to 19.5 pounds; "minimally occasionally" balance, bend/stoop, climb stairs, crouch, squat, and use the right foot; occasionally crawl, kneel, use the left foot, firm grasp bilaterally, fine grasp bilaterally, and move the neck in all directions; and frequently simple grasp bilaterally. (Tr. 543.) Dr. Godek and PT Hart determined the test was valid and that Ms. Ruff gave full effort. (Tr. 550.)

**ii. Treating Source**

On June 13, 2024, Ms. Ruff's PCP, Dr. Hanicak, completed a form medical opinion statement provided by Ms. Ruff's attorney. (Tr. 1318-19.) Dr. Hanicak affirmed that he had reviewed the FCA from March 2023, that he agreed with it, that he adopted its results, and that it was an accurate representation of Ms. Ruff's limitations from at least March 2023 to the present. (Tr. 1319.) He also checked boxes affirming that: Ms. Ruff would be unable to perform work for eight hours a day, five days a week; her migraines would be severe enough and last long enough to cause her to be tardy, leave early or be absent from work; she would need additional breaks or be off-task more than 15% of a full-time work schedule; and she would on average be absent from work at least two days per month due to her conditions. (*Id.*)

**iii. State Agency Medical Consultants**

On July 2, 2023, state agency medical consultant Douglas Chang, M.D., conducted a physical Residual Functional Capacity ("RFC") assessment. (Tr. 86-87, 96-96.) He opined that Ms. Ruff could: occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk four hours and sit six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs. (*Id.*) He further opined that she should: avoid all exposure to hazards including operating heavy machinery and unprotected heights; avoid concentrated exposure to wetness, humidity, noise, vibration, and extreme cold or heat; and avoid even moderate exposure to fumes, odors, dust, gases, poor ventilation, etc. (Tr. 87, 96.) On November 7, 2023, on reconsideration, Stephen Koch, M.D., affirmed Dr. Chang's findings. (Tr. 105-06, 113-14.)

**C. Hearing Testimony**

At the hearing on June 14, 2024, Ms. Ruff testified in response to questions from the ALJ and her attorney. (Tr. 48-66.) A Vocational Expert ("VE") also testified. (Tr. 68-75.)

The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform Ms. Ruff's prior work, but could perform representative positions in the national economy, including final assembler, order clerk, and charge account clerk. (Tr. 71-73.) She also testified that it would preclude competitive employment if the person would either be off task 20% of the time or absent more than two days a month. (Tr. 73.)

**III. Standard for Disability**

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, § 416.920[2]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq.,

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986))

---

corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

(alteration in original). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B. Sole Assignment of Error: The RFC is Supported by Substantial Evidence**

Ms. Ruff makes two distinct arguments in support of her sole assignment of error that the RFC is not supported by substantial evidence. (ECF Doc. 10, pp. 11-16.) First, she argues that the ALJ failed to account for the severe impairments of migraines and postural orthostatic tachycardia syndrome ("POTS") in the RFC. (*Id.* at pp. 11-13.) Second, she argues that the ALJ's reasons for finding the medical opinions of Dr. Godek and Dr. Hanicak unpersuasive are not supported by substantial evidence. (*Id.* at pp. 14-16.) The Court will address the two arguments in turn.

### 1. The ALJ Adequately Considered POTS and Migraines When Determining the RFC, and the RFC is Supported by Substantial Evidence

Plaintiff argues first that the ALJ erred at Step Four of the sequential analysis because "there is no related limitation assigned [for POTS and migraines] in the final RFC" and "the decision does not sufficiently explain how [POTS and migraines] were incorporated [into the RFC]." (ECF Doc. 10, p. 11-12.) The Commissioner responds that the ALJ was not required to identify which RFC limitations corresponded to each severe impairment, and that the ALJ's RFC is supported by substantial evidence. (ECF Doc. 11, pp. 6-8.) In reply, Plaintiff asserts that the ALJ "omit[ed] any medical review relating to" POTS and migraines at Step Four of the sequential analysis. (ECF Doc. 13, pp. 1-3.)

As an initial matter, Plaintiff points to no authority requiring ALJs to "assign" specific RFC limitations to specific impairments. (*See* ECF Doc. 10, pp. 11-13.) On the contrary, the regulations require ALJs to "consider the *combined effect* of all [a claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity" when determining an RFC, and to "consider the *combined impact* of the impairments throughout the disability determination process." 20 C.F.R. § 404.1523(c) (emphasis added). Moreover, as the Commissioner points out, Plaintiff does not identify specific limitations that should have been included in the RFC to account for POTS and migraines. (ECF Doc. 11, p. 8.)

As to whether the ALJ sufficiently explained his consideration of the two impairments, a review of the ALJ decision reveals that he considered the evidence as a whole, including evidence related to migraines and POTS, and sufficiently explained the basis for his RFC. The ALJ concluded that Ms. Ruff had the physical RFC to perform:

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch, and crawl.

> She could frequently be exposed to humidity and wetness, extreme cold, extreme heat, and vibration. She is able to work in (up to and including) loud noise environment. She can occasionally be exposed to dust, odors, fumes, and pulmonary irritants. She can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle.

(Tr. 24.) In support of this sedentary RFC, the ALJ considered Ms. Ruff's testimony that: POTS, vertigo, and migraines made her dizzy and prevented her from standing long; she had back and lung spasms; dust, pollen, and other irritants made her breathing worse; and she lived alone, drove a few days per week, and crafted as a hobby. (Tr. 25.) He discussed the medical records documenting Ms. Ruff's migraines, back and neck pain, and problems with extremity weakness, seizures, lightheadedness, and dizziness, including physical examinations that consistently showed no acute distress, regular heart rate and rhythm, clear lungs, full or mildly reduced strength, full or mildly reduced range of motion, intact neurological functioning, and normal coordination and gait. (Tr. 26-29.) The ALJ also considered the opinions of Plaintiff's treating providers and non-treating evaluators, finding them unpersuasive (Tr. 31-32), and the opinions of the state agency medical consultants, finding them persuasive but also finding greater limitations were warranted in light of the most recent treatment notes and Plaintiff's testimony (Tr. 30).

Regarding migraines and POTS specifically, the ALJ found both impairments severe at Step Two of the sequential evaluation. (Tr. 20.) At Step Three, the ALJ considered related treatment records and found migraines did not constitute a primary headache disorder that medically equaled a listing. (Tr. 22.) At Step Four, the ALJ considered Plaintiff's testimony that migraines lasted a few hours to a few days and that POTS and migraines contributed to her dizziness and inability to stand. (Tr. 25.) He discussed multiple treatment notes at which Ms. Ruff: reported migraines, headaches, and lightheadedness (Tr. 26 (citing Tr. 556), 27 (citing Tr. 630-31), 28 (citing Tr. 794, 1081)); was diagnosed with migraines or intractable headache (Tr.

26 (citing Tr. 369, 814-15), 27 (citing Tr. 631), 28 (citing Tr. 796, 801), 29 (citing Tr. 1228)); was diagnosed with autonomic instability (Tr. 28 (citing Tr. 801));[3] and received occipital nerve blocks and acupuncture to treat migraines (Tr. 29 (citing Tr. 1022, 1234)).

After discussing all of this evidence, the ALJ concluded that "[t]he cumulative effects of the pain, spasms, and shortness of breath related to physical impairments support limiting the claimant to less than light exertion with additional limitations[.]" (Tr. 33.) The ALJ then articulated a restrictive RFC that limited Plaintiff to sedentary work with limitations on postural activities and exposure to noise, vibrations, humidity, extreme temperatures, pulmonary irritants, and hazards such as unprotected heights and moving mechanical parts. (Tr. 24.) In this context, the Court finds the ALJ appropriately accounted for dizziness, lightheadedness, and pain-related limitations caused by migraines and/or POTS in the RFC.

Plaintiff's argument that the ALJ decision contains "ZERO discussion or review of records pertaining to her [POTS] symptoms, physician comments/recommendations, or actions taken to help mitigate her symptoms" (ECF Doc. 10, p. 12 (emphasis removed)), does not change this analysis. While arguing that the ALJ failed to consider records of her treatment for POTS, Plaintiff identifies no records that the ALJ failed to consider. She blanketly cites to the Statement of Facts included in her brief, asserting that it shows her "POTS treatment was not sparse, limited or hidden." (*Id.*) But Plaintiff's Statement of Facts cites only one record referencing POTS explicitly, a treatment record for acupuncture that simply notes Ms. Ruff's history of POTS. (*Id.* at p. 8 (citing Tr. 1231).) Beyond that, she cites one record referencing autonomic instability and two more referencing her complaints of dizziness or lightheadedness.

[3] While Plaintiff suggests that the ALJ's consideration of autonomic instability rather than POTS was insufficient to show consideration of POTS symptoms at Step Four (ECF Doc. 10, p. 12, n. 2), Plaintiff's own applications for benefits identified "autonomic instability," not POTS, as a basis for her alleged disability. (Tr. 80, 89.)

(*Id.* at pp. 6-7 (citing Tr. 649, 750,[4] 794-96).) The ALJ considered these and/or similar records in his discussion of the medical evidence. (*See* Tr. 25-29 (citing, *inter alia*, Tr. 794-96 (discussing complaints of migraines with lightheadedness), 801 (recording diagnosis of autonomic instability), 1234 (noting Plaintiff's history of POTS).) Thus, Plaintiff has not shown that the ALJ's analysis of POTS mischaracterized or failed to discuss material evidence.

For the reasons stated above, the Court finds that Ms. Ruff has not shown that the ALJ failed to consider POTS or migraines when forming the RFC or that the RFC lacks the support of substantial evidence. Accordingly, the Court finds that the first argument lacks merit.

**2. The ALJ Adequately Evaluated the Medical Opinions of Dr. Godek and Dr. Hanicak and His Findings are Supported by Substantial Evidence**

In her second argument, Plaintiff asserts that the ALJ erred in analyzing the medical opinions of Dr. Godek and Dr. Hanicak, and in particular the FCE limitations first articulated by Dr. Godek and later adopted by Dr. Hanicak. (ECF Doc. 10, pp. 14-16.) The Commissioner argues in response that the ALJ adequately discussed the findings, appropriately concluded that they were not supported and not consistent with the other evidence, and made findings regarding the opinions that were supported by substantial evidence. (ECF Doc. 11, p. 9.)

**i. Legal Framework for Evaluating Medical Opinions**

Under applicable regulations, ALJs need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024)

[4] Although Plaintiff cites Transcript page 750 as a source for a statement that Ms. Ruff "had weakness and numbness in her arms and legs consistent with her autonomic instability diagnosis" (ECF Doc. 10, p. 6 (citing Tr. 750)), that page contains results for a head CT scan and does not mention autonomic instability, weakness, or numbness (*see* Tr. 750). When the ALJ discussed Ms. Ruff's autonomic instability diagnosis, he cited a different treatment note. (Tr. 28 (citing Tr. 801); *see* Tr. 798.)

(quoting 20 C.F.R. § 404.1520c(a)). However, they must evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 404.1520c. Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2), 404.1520c(c)(1)-(5). ALJs must therefore explain how they considered supportability[5] and consistency[6] but need not explain how they considered other factors. 20 C.F.R. § 404.1520c(b)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence. *See* 20 C.F.R. § 416.920c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 416.920(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

**ii. The ALJ Adequately Evaluated the Medical Opinions of Dr. Godek and Dr. Hanicak**

In challenging the ALJ's analysis of the medical opinions of Drs. Godek and Hanicak, Ms. Ruff focuses on the findings of the FCE conducted by Dr. Godek in March 2023, which were later adopted by Dr. Hanicak. (ECF Doc. 10, p. 14 (citing Tr. 542-50, 1318-19).) She asserts that the ALJ's analysis of the FCE limitations was inadequate because the ALJ: (1) listed the medical conclusions in the FCE testing without also detailing the positive examination findings (or "inner workings of the FCE test") that supported those conclusions (*id.* at p. 14); and

---

[5] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion. *See* 20 C.F.R. § 404.1520c(c)(1).

[6] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record. *See* 20 C.F.R. § 404.1520c(c)(2).

(2) performed a "selective review" of related records by "reviewing only asthma/pulmonary issues" while "ignor[ing] the objective findings relating to other conditions" (*id.* at p. 15).[7]

On March 15, 2023, Dr. Godek and PT Hart completed a Whole Body FCE of Ms. Ruff, finding her limited to light work with additional sit/stand, postural, and manipulative limitations. (Tr. 550.) On June 13, 2024, Dr. Hanicak reviewed the FCE and affirmed its findings, opining that it accurately represented Ms. Ruff's physical limitations from at least March 2023. (Tr. 1319.) The ALJ discussed the persuasiveness of the FCE limitations as follows:

> On March 15, 2023, the claimant underwent a Functional Capacity Evaluation at Lake Health and the results were considered valid. She was found capable of working 4 hours per day and could sit four hours total, and 45 minutes at one time. She could stand for a total of 1 hour, but only ten to twenty minutes a time. She could walk two to three hours in a workday, with occasional, moderate distances. She could minimally balance, stoop, or climb stairs. She could minimally crouch or use right foot controls. She could occasionally use her left foot. She could frequently grasp bilaterally. She could occasionally perform firm grasping bilaterally. She could occasionally perform fine grasping bilaterally. She could occasionally move her neck in all directions. She could occasionally kneel, and minimally to occasionally squat. During evaluation, she notably had shortness of breath (Ex. 2F/6). <u>This opinion was not persuasive because it was not supported by nor consistent with the evidence or the opinions of the state agency medical consultants</u>. <u>Further, the claimant had multiple workups regarding her respiratory impairments, which were not consistent with the observations of the therapist performing this examination and only reflects her abilities on one day, rather than the longitudinal period</u>. Cordt Skraba, APRN-CNP saw the claimant on April 30, 2024 for follow up of asthma []. Her sitting and supine spirometry was not repeatable. Examination showed no wheezing and good breath sounds bilaterally []. She stated her breathing was awful since she had COVID twice, once in 2020 and once in 2021. She felt like her left lung never filled up with air. She was diagnosed with severe persistent asthma, dyspnea and respiratory abnormalities, and environmental allergies []. She was prescribed theophylline and Dulera []. Previously spirometry showed variable extrathoracic obstruction. She had varying levels of eosinophilia in the past. On July 11, 2023, pulmonary function testing showed normal spirometry with no significant bronchodilator response [].

[7] Because Plaintiff's arguments target the ALJ's evaluation of limitations identified in the FCE (*see* ECF Doc. 10, pp. 14-16; ECF Doc. 13, p. 4), any potential arguments regarding other elements of the relevant medical opinions are deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")(internal citations omitted) (alterations in original).

> However, on June 27, 2023 the claimant underwent pulmonary function testing, which showed a mild obstruction [].

(Tr. 31 (citations omitted) (emphasis added).)

Ms. Ruff argues first that the above analysis is insufficient because the ALJ did not acknowledge certain internal findings from the FCE that supported and added validity to the opined limitations, including observations of apparent pain with lifting and postural movements, trembling arms, shifting weight while standing, and back/leg weakness. (ECF Doc. 10, p. 14.) Effectively, she is challenging the ALJ's assessment of the "supportability" of the FCE, i.e., the extent to which Dr. Godek's objective findings and supporting explanations substantiated or supported the findings in the FCE. *See* 20 C.F.R. § 404.1520c(c)(1). Ms. Ruff is correct that the ALJ did not discuss the underlying observations or supporting explanations in the FCE itself when he addressed the overall supportability of the FCE. Instead, he observed that the FCE "only reflects [Ms. Ruff's] abilities on one day, rather than the longitudinal period," and found generally that the limitations in the opinion were not supported by the evidence. (Tr. 31.) Since the ALJ was not "required to discuss each piece of data in [his] opinion," the question before this Court is whether the ALJ nevertheless "consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin*., 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec*., 167 F. App'x 496, 507-08 (6th Cir. 2006)).

Considering the ALJ's findings in the context of the entire written decision, the Court concludes that Ms. Ruff has not shown that the ALJ erred in analyzing the supportability of the FCE opinion. In his earlier analysis of the medical treatment records, the ALJ considered: Ms. Ruff's treatment for back pain in April and May 2023 (Tr. 26); chiropractic treatment for neck and back pain in August 2023 (Tr. 27); cervical spine x-rays showing minor disc space narrowing in August 2023 (Tr. 28); normal physical examination findings in August 2023 (*id.*)

and January 2024, but with reported weakness in her limbs (Tr. 29); and unsuccessful injections and physical therapy in March and April 2024 (*id.*). Based on this broader record, the ALJ concluded that "the longitudinal record does not reflect a significant degree of functional limitation from the claimant's impairments" (Tr. 25), further explaining:

> The cumulative effects of the pain, spasms, and shortness of breath related to physical impairments support limiting the claimant to less than light exertion with additional limitations as noted above. Examinations do not reflect the degree and frequency of pain and other symptoms one would expect based on testimony and allegation of symptoms. Examination findings also do not support loss of strength, range of motion, sensation, reflexes, or coordination that would support a disabling degree of limitation. The medical evidence, even with a consideration of limitations from pain and other symptoms, does not support a greater degree of limitation than that which is set forth in the above residual functional capacity assessment.

(Tr. 33.) Thus, the ALJ considered treatment records that substantiated—at least in part—the types of limitations and pain behaviors that were noted in the FCE and highlighted in Ms. Ruff's brief (*see* ECF Doc. 10, p. 14) but considered those findings in the context of a longitudinal record that the ALJ found did not support the level of functional limitation or the frequency of pain and other symptoms described by Ms. Ruff. In this context, the Court finds the ALJ did not err when he focused his supportability analysis on the fact that the FCE findings "only reflect[] [Ms. Ruff's] abilities on one day, rather than the longitudinal period" (Tr. 31), and that the ALJ did not "cherry pick" or mischaracterize the record when he chose not to explicitly discuss the "internal findings" from the FCE that are identified in Ms. Ruff's brief.

In her second argument, Ms. Ruff asserts that the ALJ performed a "selective review" of related records by "reviewing only asthma/pulmonary issues" while "ignor[ing] the objective findings relating to other conditions." (EFC Doc. 10, p. 15.) This is effectively a challenge to the ALJs analysis of "consistency," i.e., the extent to which the FCE findings are consistent with the evidence from other medical and nonmedical sources in the record. *See* 20 C.F.R. § 404.1520c(c)(2). Again, the question before this Court is not whether the ALJ "discuss[ed] each

piece of data in [his] opinion," but rather whether he "consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley* 397 F. App'x at 199.

Considering the ALJ's consistency findings in the context of his whole decision, the Court finds Ms. Ruff has not shown that the ALJ erred in analyzing the consistency of the FCE opinion. As discussed above, the ALJ had already discussed medical records detailing Ms. Ruff's treatment for back pain in 2023 and 2024, including her complaints, treatment modalities, x-ray results, and physical examination findings (Tr. 26-29), before concluding that her exam findings "d[id] not reflect the degree and frequency of pain and other symptoms one would expect based on testimony and allegation of symptoms" and "also d[id] not support loss of strength, range of motion, sensation, reflexes, or coordination that would support a disabling degree of limitation" (Tr. 33). Having separately described these findings, the ALJ did not have to "reproduce the list of these treatment records a second time when [he] explain[ed] why [the FCE] opinion was inconsistent with this record." *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) 7 (citing *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

In addition to the treatment records relating to Ms. Ruff's spinal conditions, the ALJ also considered the opinions of the state agency medical consultants that Ms. Ruff could perform a reduced range of light work with postural limitations and other limitations in climbing, environmental conditions, and exposure to hazards. (Tr. 30.) While he found the state agency opinions persuasive, the ALJ found further limitations appropriate as follows:

> These opinions were persuasive because they were supported by the medical evidence of record and consistent with each other. The state agency consultants' opinions are informed by program knowledge. However, the undersigned did add additional limitations to account for the claimant's most recent treatment and subjective complaints. Examination showed normal bulk, strength, and tone and no normal rapid alternating movements and coordination (Ex. 12F/42). Sensation was

> intact to light touch, pinprick, proprioception, and vibration. She had a casual gait. Her neurological exam was intact without focal deficits (Ex. 12F/43). She had no obvious family history to suggest an episodic weakness disorder or a progressive dystrophy (Ex. 12F/43). She did not have left torso or left upper extremity sided chronic pain associated with these symptoms. She described weakness of her limbs (Ex. 12F/43). There was no evidence of a C3 palsy in respects to a phrenic nerve dysfunction (Ex. 12F/43). She had prior extensive evaluations for very chronic dyspnea and an intermittent sense of weakness that is rather generalized. She had weakness in her limbs. The undersigned further limited the claimant to sedentary work based upon her testimony and the later medical evidence regarding her symptoms of weakness and spasms.

(*Id.* (emphasis added).)

It is in the context of these prior findings that the Court considers the ALJ's finding that the FCE limitations were "not persuasive" in part because they were not "consistent with the *evidence* or the *opinions of the state agency medical consultants*." (Tr. 31 (emphasis added).) Although the ALJ's analysis of the FCE only discussed treatment records and findings relating to Ms. Ruff's respiratory impairments, his general references to the evidence and state agency opinions effectively incorporates his prior discussions of the medical records and state agency opinions, and therefore indicates he appropriately considered the examination findings and treatment modalities relating to all of Ms. Ruff's physical impairments, including those associated with her complaints of pain and weakness in the FCE. The Court therefore finds that the ALJ adequately articulated how he considered the consistency of Dr. Godek's opinions in the FCE and by extension Dr. Hanicak's opinion affirming that FCE.

Plaintiff's citation to a non-binding, unpublished Report and Recommendation from this Court does not change the analysis. (*See* ECF Doc. 10, pp. 14-15 (citing *Carpenter v. Comm'r of Soc. Sec.*, No. 5:22-CV-2043-CAB, 2023 WL 6005943 (N.D. Ohio Aug. 7, 2023), *report and recommendation adopted*, 2023 WL 7190155 (N.D. Ohio Nov. 1, 2023)).) The court in *Carpenter* found an ALJ engaged in an improper, selective review of the records by omitting discussion of: FCE findings regarding the claimant's ability to sit, stand, and walk; examination

findings relating to the claimant's gait, balance, and breathing; findings that the test results were valid and the claimant gave full effort; and the fact that the FCE "was one of the most recent medical records contained in the file and post-dated the review by the state agency reviewing physicians." 2023 WL 6005943, at *13. Here, as discussed above, many objective observations in the FCE highlighted by Ms. Ruff are parallel to findings in other medical records that the ALJ did discuss. Further, unlike the ALJ in *Carpenter*, the ALJ in this case explicitly found the FCE limitations "not persuasive" in part because the treatment records "were not consistent with the observations of the therapist performing th[e] [FCE] examination," which "only reflect[ed] [Ms. Ruff's] abilities on one day, rather than the longitudinal period." (Tr. 31.) Moreover, the FCE in this case was completed only two months after the amended alleged onset date, was considered by the state agency medical consultants (Tr. 82) whose opinions the ALJ found persuasive (Tr. 30), and was contrasted with medical treatment records that largely post-dated the FCE and showed primarily normal physical examinations (Tr. 26-29). The record also reflects that the ALJ in this case acknowledged that the FCE results were deemed valid. (Tr. 31.) For all of these reasons, the Court does not find *Carpenter* persuasive in this case.

For all of the reasons set forth above, the Court finds that the ALJ considered the full record in assessing the FCE-based opinions of Dr. Godek and Dr. Hanicak and appropriately articulated his reasons for finding the opinions unpersuasive. The Court further finds that Ms. Ruff has not met her burden to show that the ALJ's findings lacked the support of substantial evidence. Accordingly, the Court finds that the second argument lacks merit.

## V. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.

September 30, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge